The evidence on the part of plaintiff: "In the negotiation of the contract alleged in paragraph three of the complaint, I dealt with M. A. Biggs, salesman for the C. E. Johnson Realty Company, and Mr. Russell Johnson, secretary of the company; I purchased the lot from the C. E. Johnson Realty Company through Mr. Biggs as salesman. Before the contract expired I asked Mr. Biggs to make arrangements to relieve me of the lot, that I was not satisfied with it, would not retain the lot and that I wanted to deed the lot back to them, and they to refund the money in accordance with the terms of the contract. Mr. Biggs asked me to give him further time in which to turn the lot and if I would do that he would extend the contract for another twelve months, that he would confirm the contract for another twelve months. After argument, then, or request that I make this extension or give him further time in which to comply with the contract, he made this notation on the bottom of the contract, extending the time for the fulfillment of the contract for another twelve months. (At this point in the testimony of the witness, Dixson, the plaintiff introduced the memorandum of agreement referred to in the testimony. It is as follows: `We sell the earth — C. E. Johnson Realty Company — Real Estate and Fire Insurance — Reputation our capital — Reliability and Promptness — Winston-Salem, N.C. 6 November, 1928. . . . C. E. Johnson Realty Company hereby agrees to refund to T. B. Dixson, the full purchase price of $4,837.80 for lot No. 14, in "Stratford Place," with 6 per cent interest, on 6 November, 1929, in the event the above named purchaser should not be entirely satisfied with purchase of said lot. Yours very truly, C. E. Johnson Realty Company, by C. E. Johnson, pres. Attest: R. C. Johnson, Sec. . . . We hereby agree to renew the above contract and extend the terms and guarantee for another twelve months to 6 November, 1930. C. E. Johnson Realty Company, by R. C. Johnson, treas. M. A. Biggs, witness.'
Before the expiration of that amendment I made further demands on Mr. Biggs that he take up the lot and refund the money, and he came back and asked that I allow him a little further time in which to complete the sale of the lot as he had several folks in view that he could sell it to and he would then refund the money to me, stating then that if I would do that he would get the contract renewed for another twelve months. I agreed with Mr. Biggs to allow him to do that. Mr. Biggs stated he would get Mr. Russell Johnson to make notation on the books of the C. E. Johnson Realty Company and also make notation on the original contract and that he would have Mr. Johnson call by my office and give me this confirmation. After some time had elapsed Mr. Johnson had not come in, I called Mr. Biggs' attention to it again and he said Mr. Johnson had already told him he would attend to it and had made *Page 523 
notation on the books and would bring the necessary papers by my office at the first opportunity. I called on Mr. C. E. Johnson in the latter part of October, 1931, or the first of November. I called by C. E. Johnson Real Estate Company's office and asked him what he was intending to do in relation to complying with the terms of the contract he had given me. Mr. Johnson replied that he didn't know anything about a contract. I said `Mr. Johnson, do you mean to tell me that you don't know anything about the contract you signed?' He said, no, that he didn't know anything about it. I said, `Well, I have a contract signed by you, unless it is a forgery, agreeing to take back a lot from me and refund the purchase price.' He asked me where it was. I said `I have it in my pocket.' He said `Let me see it.' I showed it to him. He admitted then he had signed it. He said `That is some of Biggs' and Russell's foolishness; had no business making a contract like that.' I said `I can't help that. I was depending on the integrity and reliability of the C. E. Johnson Realty Company to live up to a contract made by them, signed by you as president, and never once questioned it and would like to know what you are going to do about it. I am ready to comply with my part of the contract.' Mr. Johnson replied `Those boys lost enough money for me already. I just can't afford to lose any more money. I am sorry for you but I can't comply with it.' I said, `Mr. Johnson, I think you ought to look at it in a different light from that. You made a contract, admit that you signed it, and I was relying on that to protect me and I expect you to live up to your part of the contract.' Mr. Johnson said, `I am sorry but I have lost all the money I can afford to lose and I am not going to do it.' I saw Mr. Biggs at least once a month during the year after the execution of the contract. He would come by the store. I would ask him how he was getting along with the sale of the lots so he could relieve me and he would tell me he had so many prospects for it and so forth, and that he could turn it in a short time. It was in September or October, 1929, that I first advised him that I would want to exercise my option to sell to the C. E. Johnson Realty Company. During the year I had other conversations with him in which I told him I had bought the lot for an investment with his promise to refund the money and I expected him to refund it at the expiration of the contract. Mr. Biggs stated to me he had several good prospects for buying the lot and that if he didn't close the deal before the contract date he would live up to the contract and refund the money, but in case he didn't, if I would give him a few more months in which to work on the lot he was sure he could turn it at a nice profit, and if I would do that, in case he didn't turn the lot, he would have the C. E. Johnson Realty Company to renew or confirm the original contract that they would refund the purchase price at the end of another year, provided he had not been able to turn the lot." *Page 524 
On cross-examination, plaintiff testified: "I made the following payments on the indebtedness on the property I have just testified about: On 29 February, 1929, $105.00; on 29 February, 1930, $439.80; on 29 February, 1931, $439.80; on 29 August, 1929, $439.80; on 29 August, 1930, $439.80; on 29 August, 1931, $439.80 — I made two payments of $439.80, each in 1932."
Redirect examination: "I made the payments that I have just mentioned to Wachovia Bank and Trust Company, except a payment to C. E. Johnson Realty Company on 29 February, 1929. It was in the amount of $800.00 and was past due from the former owners, Hardin C. Graham and wife. It was a part of the cash payment. I am and have always been ready, able and willing to make a conveyance of this property to the defendant."
Plaintiff rested. At the close of the plaintiff's evidence the defendant moved for judgment as of nonsuit. Motion allowed. Plaintiff excepted. The plaintiff excepted to the signing of the judgment as of nonsuit, assigned error and appealed to the Supreme Court.
At the close of plaintiff's evidence the defendant made motion in the court below for judgment as in case of nonsuit. C. S., 567. The court below allowed the motion and in this we think there was error.
The questions involved: (1) Defendant admits its agreement to buy, at the plaintiff's option, a residential lot or parcel of land. Upon a motion of nonsuit, is there sufficient evidence of plaintiff's exercise of his option and his readiness and ability to convey to the defendant upon its payment of the price? We think so. (2) Is the defendant relieved of the obligation of its contract by failure of strict performance by the plaintiff, where, at the defendant's request, a modification of the contract was agreed to by the plaintiff extending the time for defendant's performance? We think not. (3) Was there sufficient evidence to be submitted to the jury as to the authority of M. A. Biggs, salesman for defendant company, to modify the contract by plaintiff's extending the time for defendant's performance? We think so.
We think the principle in Alston v. Connell, 140 N.C. 485, where a wealth of authorities are set forth, applicable. At p. 491-2, we find: "These facts, so established, declare that the plaintiff had arranged or was arranging to raise the money within the time required by the option, when he was notified and requested by the defendant that a postponement was desired for a year, until 1 January, 1901, and the plaintiff *Page 525 
agreed to the proposition. Within the time fixed by the postponement, the plaintiff went to the defendant with the money, tendering the amount required by the agreement and the same was refused. The plaintiff, having consented to the delay at the request of Thomas Connell, will be taken to have been ready and willing to perform at the time stipulated in the written agreement; having tendered the amount due within the period fixed by the postponement, he is in no default, and the extension having been given at Thomas Connell's request and for his convenience, when the extended agreement itself and all the circumstances clearly implied that he regarded it as a valid and binding contract and that the intended to live up to its terms, the law will not permit him now to repudiate its obligations, invoke for his protection the statute of frauds and defeat the plaintiff's recovery, who had forborne a timely performance by reason of Thomas Connell's request and in reasonable reliance on his assurance. This position is in accord with sound principles of justice and is well sustained by authority."
The defendant contends that the plaintiff knew that Biggs had no authority to bind defendant. We think, under the evidence in this case, that this is a question of fact for the jury to determine. Powell v. LumberCo., 168 N.C. 632; Bobbitt v. Land Co., 191 N.C. 323; Maxwell v.Distributing Co., ante, 309. For the reasons given the judgment of the court below is
Reversed.